Good morning. My name is Michael Barcott for Alaska National. I'd like to reserve one minute for rebuttal, please. That's fine. Go ahead. I just want to be certain the court understands the procedural posture that this case is in at the present time. Mr. Okada, the injured individual, his case has been settled. He is he's been taken care of and has no interest in the outcome of this appeal. Kelly, right. So just a question of which insurer should be responsible for it should be or did or was the P&I insurer did pay it and should have paid. Kelly Ryan, the nominal insured here, has got coverage one way or the other. And although they're represented by the same they're represented by the same counsel as the P&I carrier, they have not weighed in independently on this issue. So we are left with the dispute between the two insurance carriers. Well, to them, they have no interest, do they? They have no interest in this. There's plenty of coverage either way for them. So I'd like to use my time this morning to discuss the trial court's error in looking beyond the face of Mr. Okada's complaint to assess the duty to defend and the trial court's error in excluding evidence of the party's intent when they entered into these insurance policies. Well, let's see. Before you start talking about duty, what was the case in the district court all about? This case or Mr. Okada's case? No, I'm talking about in the district court. Right over here.  Down the street. There were two cases, Your Honor. There was Mr. Okada's case. Let's put Mr. Okada's case aside for a moment. Very well. Okay. Just what was the case, what were they seeking in district court here? What was the complaint all about? The complaint was all about that the P&I carrier brought the complaint under an assignment from Kelly Ryan. And what were they seeking? What kind of death relief were they seeking? They were seeking a declaration, declaratory relief, and later amended after they paid the money to seek damages, that the P&I carrier did not have a duty to defend, that the MEL carrier did, and that the P&I carrier had no duty to indemnify or pay the debt. Was it about a duty to defend or was it about indemnity? As originally submitted on the motions, the issues, frankly, were not well separated. On the motion for reconsideration, they were precisely separated. And we pointed out to the Court, and the Court agreed on the motion for reconsideration that it was not about indemnity. The only issue was duty to defend. And the district court explicitly said that in its ruling on the motion for reconsideration, very explicitly. Now, in the State of Washington, I gather the duty to defend is broader than the duty to indemnify. The duty to defend is – Washington is similar to California. The duty to defend is significantly broader. And it is just such clear black-letter law that that duty is triggered by the allegations of the underlying plaintiff's complaint. And if they implicate a policy, the duty to defend attaches to that. Didn't Century step in and defend? I'm sorry? Didn't Century step in and defend? They did step in and defend, and now they're asking for their money back, saying they didn't have that duty. It was Alaska National's. I thought they were seeking a declaration of whether or not they had an obligation to indemnify under their policy. They were – no. They were seeking a declaration that Alaska National had the obligation, and after the money was paid, they amended to ask for money damages, the money spent on defense and the money spent for the settlement. Both of those components were added after the settlement. Well, I thought it was under your policy if there was another carrier that was obligated to pay, and you didn't have to pay. That's absolutely – that is precisely right. That is right. They were trying to establish it under their policy. They didn't have the obligation to pay. That's exactly what they were trying to establish. That's correct. And if they ultimately established that, then whether or not they had a duty to defend, they would be entitled to reimbursement from you guys. They'd be entitled to – we need to separate these out. They spent about $170,000 in defending. If they had the obligation to pay those defense costs, that is not Alaska National's duty. If it is determined under the narrower duty that Alaska National had the obligation to indemnify or Alaska National – that this fell under Alaska National's policy, they would have remained responsible for the defense costs. Not an – not a – not an insignificant sum here. And the trial court is just very, very clear. It looked beyond the allegations of the complaint. If there were no insurance carrier here to catch, if you will, the – the part that they say they don't cover, they would never have made that argument. But because there is an insurer here, you can understand, well, let's just sort this out. Let's don't pay attention to the allegations of the complaint. Let's figure out what's really going on here. There's simply no rule that allows a different application when there is an insurance company ready to catch the liability, if you will. Well, let me ask you this. At what point, then, do you decide whether or not they ever have an – they have an obligation to indemnify under their policy? After a – after a trial. The trial we did not have. And there will be two components. After trial in this case or after trial in the – in the underlying case? Of necessity, because the underlying case is settled, we will try in this case whether the vessel owner was negligent in its capacity as vessel owner. We'll put on that evidence here and also put on evidence of the intent of the parties when they placed the policy. If the underlying case had gone to trial and there were findings of fact, we'd be in the same situation that the Fifth Circuit was in in the Linas case, where there was a trial, there was a finding of no liability on the vessel owner's part, and at that point there's nothing left to litigate. But that didn't happen here, so we'll have to do that in this case. This case is unlike the City of San Francisco case decided by this circuit. In the City of San Francisco case, of course, there is a – an insured vessel, and then Seaman goes to work on a couple of unowned, uninsured barges, and this Court properly said the P&I underwriter didn't sign up for this obligation. They had no idea that this fellow was going to be working over here. He was not subject to the call of the insured vessel. He wasn't working under orders from the insured vessel. He wasn't working on a captain of the insured vessel. All of those factors exist here to make this very unlike the City of San Francisco case. The differences – the differences are stark and they are significant. The issue of the intent of the parties is extraordinarily important. Judge Brown, in the Linas decision out of the Fifth Circuit, indicated that the line between coverage and non-coverage on a P&I policy is a wavy one, and if the court – the district court had considered the evidence of the party's intent, it would have found that there were sophisticated brokers, sophisticated insurance people. This isn't a run down to State Farm and get an insurance company kind of case. These people tried to put together a very sophisticated package that covered Kelly Ryan and dovetailed perfectly. The court said – the district court explicitly said, I will not consider evidence of intent absent in ambiguity in the policy. That is simply not the rule in this State. The rule in this State, under the Berg decision that we've cited in our brief, is it is not necessary for there to be ambiguity. The party's intent at the time of contracting is helpful information. Counsel, I don't want to interrupt you, but I want to ask you a question. All right, now. Any time, Your Honor. Well, if the original complaint or petition by the injured seaman alleges some vessel connection, the captain says, we've got to do some additional transportation of this here with me, and somehow, as this general allegation did, I think, and suppose the P&I carrier does have to defend, but it develops now without any issue, let's assume, hypothetical, that there was no vessel connection. This was entirely a different volunteer acting on the roof of this building. And clearly, we now know there's no P&I coverage. Is there any law, or what is the law, on the P&I carrier getting back the expense of defense? Where we now know all of the coverage is confined to your client. Your Honor, if, actually, I'll speak to hypothetical after I answer the question. I'm sure. If you then learn there is no P&I cover, there is no ability to get the money back from my no other policy here to catch it. The complaint triggers the duty, and you pay on that duty. And if you ultimately prevail, bless you. I don't know what the law is on trying to get it from the insured. Right. And it should be no different, because there is another insurer. If they had that duty, that duty was paid for in the premium to the P&I carrier. They have that obligation. I would also say that if the Court would consider the intent of the parties, even if we accept your Honor's hypothetical, there is no vessel owner negligence whatsoever in capacity as vessel owner. When you look at the intent of the parties, it appears that these parties intended that these policies fit together a little differently than they would if you just had a blank policy, what appeared to be the case in the Lamas decision and the City of San Francisco decision, because the evidence from both brokers is that MEL policy was not intended to cover traditional crew, and the P&I policy was intended to cover traditional crew working ashore. So the intent actually gives a slightly different meaning to this P&I policy than just the four corners and the Lamas decision and the City of San Francisco decision. Another hypothetical. Suppose the Court now should decide that the duty to defend did fall on P&I carriers, but that the coverage after the case has been developed, we know more than the allegation, that the coverage is yours. Then what is our judgment? The judgment at that point, if those were the ultimate decisions, the judgment would be, we are obligated to indemnify the P&I carrier remained on the hook for the defense costs which were properly under its policy. I see that my time is up. All right. Thank you very much, unless there are other questions. No. Thank you very much. Thank you, Mr. Markoff. My name is Donald McClan and I'm representing Kelly Ryan and the G&I underwriters in this case. Could you say you're representing Kelly Ryan? Yes. Are they a party here? They are a party here. I didn't think they had an interest. Well, to the extent there's a. You're also representing the century, right?  So the P&I underwriter's here. The P&I underwriters. Kelly Ryan and the P&I underwriters. Go ahead. Initially, I just want to point out the facts of the actual accident, because I do think it is fairly important. And these facts were developed within very shortly after the accident happened, and each insurance company had the obligation to determine what the facts were. I think that the law in Washington determining the duty to defend is such that you initially take a look at the allegations of the complaint. If the allegations of the complaint are ambiguous, then you take. You have to actually make a determination from the actual facts as you know they were. In this case, both Alaska National and the P&I underwriters knew what the actual facts were. They knew what the operation was. In that case, I do think it's important to describe exactly what the facts were. The facts were such. James Okada is a scene assigned to the case summary. Kelly Ryan is set up such that when the crew members don't have any crew duties, they can help the shore-based crew. The captain tells the crewman, make sure you finish your job duties and you can go and help. The fact of the matter is that the crew members get paid additional money for this, for doing jobs that aren't related to their vessel duties. James Okada was actually getting paid additional money to help out in this case. James Okada was asked by the land-based crew to help out with a house-moving project. I have a brief background on the house-moving project. The house-moving project was that the houses were manufactured in Anacortes. They were transported up to Alaska. They were transported up to Alaska on a barge, the Bristol Bay Trader, that is owned by Northland Services. It was not insured by Kelly Ryan. It was towed by a tug by the name of Gene Dunlap, which is owned and operated by Dunlap Towing Company. And once again, there's no connection with Kelly Ryan in those things. So the transportation of the house itself was totally unrelated to the case summary. He gets up there. The case summary happened to be in town because they had to move barges further up the river. He didn't have any vessel-related duties, so he went to do his work on the shore side. He was, at that time, not dealing with vessel-related operations. Under the City of San Francisco case, which follows Lanasz and the Fifth Circuit decisions, is that, this is a quote, the language has uniformly been interpreted to mean that only liability connected with a negligent operation of the listed vessel is covered. The negligence here was a failure to provide a safe place to work, and basically that didn't have anything to do with the operation of the case summary. It's undisputed that if James Okada had been on the barge, this would have been the same case as the City of San Francisco. We would have been working on a barge that wasn't insured under the policy. The fact that he's handling cargo from that barge a mile and a half inland, dealing with nothing with the case summary, indicates that there's no coverage under the P&I policy for this case. Turning to the more vexing issue, which I think is playing on the Court, is the distinction between the duty to depend and the duty to indemnify. I think it's fairly clear the facts, as established, indicate that there is no coverage under the P&I policy. The Court needs to look at the, once again, under Washington law, an insurer, in this case both P&I underwriters and Alaska National, have an obligation to take a look at the actual facts of the case to determine whether there's coverage under their policy. In this case, what Alaska National is doing is they're saying, well, the complaint is ambiguous and that, well, they don't say it's ambiguous, because if it was ambiguous, then they'd also have to take a look at the facts of the case. But Alaska National, like P&I underwriters, had an affirmative duty to figure out who had the duty to defend in this case. I'd also like to have the Court refer to the actual complaint. The complaint in liability basically bases its liability on two different things. At that time and place, the case summary and her barge were unseaworthy. Second of all, it says the defendant negligently failed to provide the plaintiff with a safe place to work. Now — Kennedy. Now, when it alleges unseaworthiness, that sounds like your claim. Shah. Correct, Your Honor. We're not distinguishing that fact at all. The unseaworthiness claim is covered under the P&I policy. However, at the time the motion was filed, the unseaworthiness claims had been dismissed. I think that's fairly important. So the only thing you have left is negligently failing to provide a safe place to work. As Your Honors are aware, that's an obligation under the Jones Act. And that runs to the employer, and basically that's what the city of San Francisco says, is that it doesn't matter if he's a seaman. The obligation as an employer, you have to take a look at what was actually being done at the time of the accident. So at the point in time the unseaworthiness obligations have been dismissed, you have an ambiguous complaint. At that point in time, both insurance companies are obligated under Washington law to determine what the actual facts are and where coverage is. Additionally, Washington law is cited by the Ninth Circuit in the Boxes, and it says that if there's covered allegations in the complaint and uncovered allegations in the complaint, it is possible to segregate those and that no problem. You say the unsafe place to work was dismissed before the time of the motion. What motion? I'm sorry. The unseaworthiness claim was dismissed prior to the motion for summary judgment filed by Kenai Underwriters, and that was subject to the order in this case. In the later case. Correct. Between last and century. It had been dismissed. Where was it dismissed in Okada's case? In response to discovery requests as the basis for the claim for unseaworthiness. I'm sorry. I can talk up. In response to discovery. I'm not catching your word. I'm talking too quickly. I hear your voice, but I don't get your word. Sorry. What was happened in the underlying case is that in response to discovery requests, specifically asking for the basis for the unseaworthiness allegation. Discovery request by your client. By Kelly Ryan to James Okada. Right. James Okada's specifically dismissed the unseaworthiness allegation. I see. And that is within the record. I see. The only thing that was remaining at the time, the motion for summary judgment was filed in the declaratory action. Declaratory judgment action was whether or not the duty to defend as to the Jones Act allegations in the complaint. Correct. I'd like to turn quickly to the extrinsic evidence argument. Extrinsic evidence is within the record, and the court can take a look at it. First of all, there is no evidence whatsoever that indicates that P&I underwriter or the broker intended to alter the scope of the as-owner language in the P&I policy. Basically, the P&I broker that placed it said, we just basically placed the same insurance that was placed before. This is somewhat unusual because there was a broker for the P&I policy and there was a broker for the MEL policy, and there wasn't necessarily the matching up that has been indicated by Mr. Barkoff. So we have that language. The language that the P&I underwriters, because under Washington law, you have to take the extrinsic evidence to explain the actual language in the contract. You're not allowed to take intent to change. You're supposed to determine what is actually written, the meaning of what is written, and not the meaning of the intent of the part. It's unilateral meaning. The insurance policy, Alaska National, I think they admit here, says that it will cover this loss and it covers damages to a master or member of a crew. They say that the extrinsic evidence somehow or another indicates that what they were trying to do in that situation was alter the language of master or member of the crew to untraditional crew members. There's no evidence that that was ever discussed. There's no evidence that that's what the purpose was. The only evidence was that the P&I policy was placed. The P&I policy was placed in this case. It seems apparent that the broker didn't quite understand the as-owner limitation in the P&I policy. And basically, the position we're in here is that Alaska National admits that if this claim is not covered under the P&I policy, then it falls under their policy because they insure maritime risks to injuries to masters, members, or crew. And that's what we have here. I don't know if the Court has any further questions. I do think the Court has raised the red herring in trying to blame the negligence of the captain. The captain, I think it's fairly clear from the record, had no involvement in the operation whatsoever other than the fact that at one point in time he walked the route. He wasn't involved in any decision-making processes. He wasn't involved in choosing Mr. Okada. He wasn't even on site when the accident happened. I have no further questions. Okay, thank you. Your time is up. You just wanted an opportunity for a brief rebuttal? Brief rebuttal, if I may. Go ahead. Thank you very much. On the issue of the intent and the master and the member of the crew language reflects a misunderstanding of counsel. Master and member of a crew attaches to seamen. You've got traditional seamen, the crew members. You've got nontraditional seamen, the construction workers who happened because of the vagaries of maritime law to be able to be called masters and members of the crew. The evidence of intent would have made it clear that as to crew, it's the P&I policy. As to the nontraditional crew, it's the EMEAL policy. I'm attempting to change the meaning of those words. We're attempting to flesh them out. Mr. McClain makes my point that Captain's negligence is precisely his failure to do anything. That is his negligence. Thank you very much. All right, thank you. Thank both counsel. This case is submitted for decision.
judges: Reavley , Tashima, Paez